```
                    UNITED STATES DISTRICT COURT
                    NORTHERN DISTRICT OF INDIANA
                          HAMMOND DIVISION


JOHN BERRIOS and NORA BERRIOS,  )
                                )
          Plaintiffs            )
                                )
     v.                         )   Case No. 2:02 cv 373
                                )
DANIEL KENDER, HAMMOND POLICE   )
DEPARTMENT, UNKNOWN OFFICERS    )
JOHN AND RONALD DOE, SHAWN      )
McDANIEL, OFFICER HOWARD,       )
                                )
          Defendants            )
```

OPINION AND ORDER

This matter is before the court on the Motion for Summary Judgment filed by the defendants, Daniel Kender, Hammond Police Department, Unknown Officers John and Ronald Doe, Shawn McDaniel, and Officer Howard, on February 7, 2005. For the reasons set forth below, the motion is **GRANTED**.

Background

In the early morning hours of June 24, 2001, John Berrios purchased a vial containing a small amount of cocaine in the bathroom of Bugsy's, a local bar. (John Berrios Dep. p. 9) On the way home, he and his wife, Nora Berrios, topped at Oxbow Nature Preserve to try the cocaine. (J. Berrios Dep. p. 11)

At approximately 3:22 A.M., Hammond Police Officer Daniel Kender approached the plaintiffs' car to inform them that the park was closed. Kender observed John forming the cocaine into a line on top of a book which was on the car's center console. According to Kender, he knocked twice on the car's window but the plaintiffs did not respond. (Kender Report, p. 1) According to

John, he heard knocking on the window and saw a light shining on him, so he put the car in reverse because he thought someone was trying to rob him. After he heard more knocking and something about the police, he stopped trying to leave. (J. Berrios Dep. p. 12)

Eventually, one of the plaintiffs rolled down the window and Kender asked the plaintiffs to exit their vehicle. (J. Berrios Dep. p. 13; Kender Rpt. pp. 1-2) Kender reported that John then flipped the book, spilling the cocaine inside the vehicle, and placed the book inside the car's console. (Kender Rpt. p. 2) John testified that the cocaine "fell everywhere," that Kender was angry and asked him why he tried to leave, but that Kender would not let him talk. (J. Berrios Dep. pp. 13, 15) All parties agree that in the course of John's conversation with Kender, John lied to Kender about a white powder and whether he and his wife were using cocaine. (J. Berrios Dep. p. 15, Kender Rpt. p. 2) However, John testified that ultimately he acknowledged that he and Nora were using cocaine, at which point Kender started swearing at John because he lied to him. (J. Berrios Dep. p. 15)

After John denied the presence of cocaine, Kender searched the passenger compartment of the car and found the vial with a small amount of residue in it. (Kender Rpt. p. 2) Test results showed that the residue was a mixture of cocaine and caffeine. (MSJ Exh. P)

The parties disagree on what happened next, although the thrust of the testimony is the same. John testified that prior

2

to exiting the car, he told Kender that he was wearing an ankle holster containing a gun which was registered and licensed to him through the East Chicago Police Department.  Then, Kender grabbed either a gun or a stick, required John to face the car, and searched him.  (J. Berrios Dep. p. 14) According to Kender's report, John told him about the gun as he was being searched, began turning towards Kender, and reached for his waistband, at which point Kender pushed John against the hood of the squad car to force his hands up and retrieved a gun from John's waistband. (Kender Rpt. p. 2) Hammond police records indicate that John had an ankle holster.  The East Chicago Police Department could not verify whether the gun John was carrying was licensed to him. (Kender Rpt. pp. 2-3; MSJ Exh. H)

   Although John testified that he thought Nora still was in the car through the sequence of events, Kender's report and Nora's sworn statement to police indicate that she exited the vehicle with her husband upon Kender's initial request.  (Kender Rpt. p. 2; J. Berrios Dep. p. 16; MSJ Exh. O) Kender also stated that his back-up did not arrive until after Kender had placed the plaintiffs in the back of the squad car.  (Kender Rpt. p. 2) However, John testified that at some point prior to putting his hands on the squad car, other unknown officers started calling him "Jose," telling him that he was a drug dealer, using profanity, and laughing.  He also testified that an unknown officer told him that if he moved his pinky finger off the car, "we're going to beat the F-n' crap out of you."  (J. Berrios Dep. pp.

3

16, 76) In addition, he testified that one officer, who he believes was Kender but does not remember, deliberately placed him in handcuffs that were too tight. (J. Berrios Dep. pp. 16-18) He stated that after he was cuffed, the officers asked his wife some questions and placed them both in the squad car. (J. Berrios Dep. p. 17) Somewhat similarly, Nora's sworn statement says that after exiting their own vehicle, the plaintiffs waited next to the police car while Kender checked their vehicle and found the vial, and then the officers handcuffed them and told them they were charged with possession of a controlled substance. (MSJ, Exh. O)

John testified that at the police station, he and his wife were placed together on a bench for approximately one hour. At this time, his hands were black and blue and swollen from the tight cuffs, but all the officers walking past him ignored him when he asked to have the cuffs loosened. (J. Berrios Dep. p. 21) Nora testified that these passing officers constantly snick- ered at her and made comments about her being a woman, and that she was told to use the wrapper from a cheeseburger as bathroom tissue. (N. Berrios Dep. pp. 4-5) John testified that after an hour, his cuffs were removed and he and Nora were left in a room at the police station for two days without being able to make a phone call. (J. Berrios Dep. p. 26) Nora also testified to this effect, except to say that she was alone in a cell for the two days. (N. Berrios Dep. p. 5) John testified that as a result of

4

the tight cuffs, he suffered permanent nerve damage.  (J. Berrios Dep. p. 33)

On September 17, 2002, the plaintiffs filed a first complaint seeking damages for the Indiana torts of false arrest and imprisonment, assault and battery, malicious prosecution, intentional infliction of emotional distress, defamation of character, and negligence, as well as violations of the plaintiffs' First, Fourth, and Fourteenth Amendment rights pursuant to 42 U.S.C. ß1983.  The second complaint, filed July 31, 2003, asserts the same claims against more defendants.

## Discussion

As a preliminary matter, the court must clarify the parties and issues before turning to the merits of the case.  The statute of limitations for Section 1983 cases is "generally the applicable state law period for personal injury torts."  ***City of Rancho Palos Verdes, California v. Abrams***, ___ U.S. ___, 125 S.Ct. 1453, 1460 n.5, 161 L.Ed.2d 316 (2005); ***Behavioral Institute of Indiana, LLC v. Hobart City of Common Council***, 406 F.3d 926, 929 (7th Cir. 2005) ("Section 1983 claims are subject to the statute of limitations for personal injury actions in the state in which the alleged injury occurred.").  Because Indiana's statute of limitations for personal injury is two years, the statute of limitations on this Section 1983 action also is two years.  *See* I.C. ß34-11-2-4 (2004); ***Hobart***, 406 F.3d at 929.  Therefore, the plaintiffs must name each defendant on the face of their complaint before the expiration of this time period in order for the

5

cause of action to proceed against those defendants.  *See* Federal Rule of Civil Procedure 10(a).  *See also* **Baskin v. City of Des Plaines**, 138 F.3d 701, 703-04 (7th Cir. 1998); **Forman v. Richmond Police Department**, 104 F.3d 950, 965 (7th Cir. 1997).  The naming of "unknown officers" in the first complaint does not preserve the plaintiffs' right to provide actual names after the limitations period has expired.  *See* **Baskin**, 138 F.3d at 703-04 (holding that the plaintiff's second amended complaint, which named a police officer, did not "relate back" to the filing of the first complaint, which was filed against "certain unknown police officers").

　　The only defendants who are not automatically excluded from this suit by the statute of limitations are Daniel Kender and the Hammond Police Department.[1]  The events giving rise to this cause of action occurred on June 24, 2001.  On September 17, 2002, the plaintiffs filed their first complaint naming as defendants Daniel Kender, the Hammond Police Department, and John and Ronald Doe, two unknown police officers.  Although one paragraph of the complaint mentioned Shawn McDaniel, he was not named as a defendant.  On June 24, 2003, the statute of limitations expired.  Subsequently, on July 31, 2003, the plaintiffs filed their amended complaint adding McDaniel and Officer Howard as defen-

---

[1] The Hammond Police Department is not a correct defendant in this case because in Indiana, a police department is not an independent municipal entity.  *See* **Shaffer v. Brinegar**, 23 Fed. Appx. 580. 582 (7th Cir. 2001); **Thomas v. Furge**, No. 98-2265, 1999 WL 272412, at *1 n.1 (7th Cir. May 3, 1999) ("Municipal police departments are not suable entities in Indiana.").  However, the defendant do not raise this issue, so the court will not pursue it.

6

dants.  Because the plaintiffs named McDaniel and Howard after June 24, 2003 and never provided names for the other unknown officers, the two-year statute of limitations excludes the plaintiffs' claims against these defendants.  The plaintiffs concede this point by failing to defend it on summary judgment. See ***River v. Commercial Life Insurance Company***, 160 F.3d 1164, 1173 (7th Cir. 1998); ***Riley v. UOP, LLC***, 244 F.Supp.2d 928, 934 n.5 (N.D. Ill. 2003).

In addition, despite the defendants' comprehensive motion for summary judgment, the only claims the plaintiffs address in their response brief are (1) the presence of a civil conspiracy under Section 1985, (2) the custom, policy, or practice of inadequate hiring and failure to train officers and of tolerating officer misconduct, (3) the use of excessive force in their arrest in violation of Section 1983, and (4) the violation of their substantive due process rights on account of their race. Accordingly, the plaintiffs have waived the remainder of their claims.  See ***River***, 160 F.3d at 1173; ***Riley***, 244 F.Supp.2d at 934 n.5.

Without any citation to authority in support of their position, the plaintiffs claim that the defendants engaged in a civil conspiracy under Section 1985(3) because the police offi-cers' use of racial slurs, physical threats, tight handcuffs, and denial of their right to make a phone call indicated an implied agreement among the officers to deprive them of their constitu-tional rights.  (Response Brief, pp. 1-2) In addition to failing

7

to establish the existence of a conspiracy, the plaintiffs' claims are barred by the intracorporate conspiracy doctrine.

In order to establish a claim for civil conspiracy under Section 1985(3), "a plaintiff must demonstrate (1) the existence of a conspiracy, (2) a purpose of depriving a person or class of persons of equal protection of the laws, (3) an act in furtherance of a conspiracy, and (4) an injury to person or property or a deprivation of a right or privilege granted to a U.S. Citizen." **Green v. Benden**, 281 F.3d 661, 665 (7th Cir. 2002). *See also* **Hernandez v. Joliet Police Department**, 197 F.3d 256, 263 (7th Cir. 1999); **Majeske v. Fraternal Order of Police, Local Lodge No. 7**, 94 F.3d 307, 311 (7th Cir. 1996). In addition, the plaintiffs must show that the conspirators' actions were motivated by a discriminatory animus and "were aimed at rights that are protected against private, as well as official, encroachment." **Green**, 281 F.3d at 666. *See also* **Mehta v. Des Plaines Development Limited**, 122 Fed. Appx. 276, 278 (7th Cir. 2005), *cert. denied* No. 04-10030 (May 5, 2005). Furthermore, with respect to the first element of civil conspiracy, the existence of a conspiracy, the plaintiff "must show a combination of two or more persons acting in concert to commit an unlawful act by unlawful means, the principal element of which is an agreement between the parties to inflict a wrong against or injury upon another." **Smith v. LaFollette**, No. 93-2639, 1994 WL 142877, at *8 (7th Cir. Apr. 20, 1994) (internal quotations omitted). *See also* **Chicowski v. Hollenbeck**, ___ F.Supp.2d ___, 2005 WL 1181957, at *1 (W.D.

8

Wis. May 18, 2005) (same).  Agreement may be inferred only when circumstantial evidence is "sufficient to permit a reasonable jury to conclude that a meeting of the minds has occurred and that the parties had an understanding to achieve the conspiracy's objectives."  *Green*, 281 F.3d at 665-66; *Hernandez*, 197 F.3d at 263.

Here, the plaintiffs allege that the officers' behavior impliedly shows that the officers were acting in furtherance of a conspiracy.  However, the only defendant officer remaining in this case is Kender.  A "conspiracy of one" does not exist under the law.  See *Smith*, 1994 WL 142877, at *8; *Chicowski*, ___ F.Supp.2d ___, 2005 WL 1181957, at *1.  Even if the plaintiffs timely had named enough officers to make a conspiracy claim possible, the intracorporate conspiracy doctrine bars the plaintiffs' Section 1985(3) claims.

Under the intracorporate conspiracy doctrine, "a conspiracy cannot exist between members of the same governmental entity nor between the entity and one of its employees."  *Apulonu v. McGowan*,, No. 03 C 4546, 2004 WL 2034084, at *7 (N.D. Ill. Aug. 12, 2004).  *See also* *Beese v. Todd*, 35 Fed. Appx. 241, 243 (7th Cir. 2002) (*quoting* *Payton v. Rush-Presbyterian-St. Luke's Medical Center*, 184 F.3d 623, 632 (7th Cir. 1999).  This doctrine prevents a plaintiff from bringing a conspiracy claim under Section 1985(3) against the employees of a governmental entity, provided that the employees' disputed actions occurred while the employees were acting in furtherance of the government's objectives.  *See*

*Beese*, 35 Fed. Appx. at 243; *Payton*, 184 F.3d at 633; *Wright v. Illinois Department of Children & Family Services*, 40 F.3d 1492, 1508 (7th Cir. 1994).  Therefore, the plaintiffs cannot bring a claim of conspiracy between Kender and other officers, or between Kender and the Police Department, for action taken pursuant to their arrest.  Although the doctrine contains an exception for "egregious circumstances," such as a "broad pattern of unconstitutional conduct that permeates the entity," the plaintiffs fail to respond to the defendants' argument regarding the intracorporate doctrine entirely.  For these reasons, summary judgment is appropriate on the plaintiffs' Section 1985(3) conspiracy claim.

Summary judgment also is appropriate on the Berrios' claim that the Police Department had a policy, practice, or custom of inadequately hiring and failing to train its officers and of tolerating officer misconduct.  As with their Section 1985(3) conspiracy claim, the plaintiffs cite no law in support of their brief, one-paragraph argument that such policies can be inferred from their treatment by the police.  The Seventh Circuit has warned that courts need not expend limited judicial resources in researching, refining, and otherwise fleshing out arguments the parties themselves do not adequately support.  *See Tyler v. Runyon*, 70 F.3d 458, 464-65 (7th Cir. 1995); *Hershinow v. Bonamarte*, 735 F.2d 264, 255 (7th Cir. 1984).  Nevertheless, for the sake of thoroughness, this court will explain briefly why the plaintiffs' Section 1983 claims do not stand.

10

A municipality cannot be held liable on a theory of respondeat superior. *See* **Board of the County Commissioners of Bryan County, Oklahoma v. Brown**, 520 U.S. 397, 403-04, 117 S.Ct. 1382, 1388, 137 L.Ed.2d 626 (1997) ("[A] municipality may not be held liable under ß1983 solely because it employs a tortfeasor."); **City of Canton v. Harris**, 489 U.S. 378, 385, 109 S.Ct. 1197, 1203, 103 L.Ed.2d 412 (1989); **Calhoun v. Ramsey**, 408 F.3d 375, 379 (7th Cir. 2005). Rather, a municipality may be liable under Section 1983 only if a municipal policy or custom caused the constitutional violation. **Brown**, 520 U.S. at 403, 117 S.Ct. at 1388. *See also* **Monell v. Department of Social Services of the City of New York**, 436 U.S. 658, 690-91, 98 S.Ct. 2018, 2035-36, 56 L.Ed.2d 611 (1978). The Seventh Circuit recognizes three ways in which a municipality may violate Section 1983:

> (1) through an express policy that, when enforced, causes a constitutional deprivation; (2) through a "wide-spread practice" that although not authorized by written law and express policy, is so permanent and well-settled as to constitute a "custom or usage" with the force of law; or (3) through an allegation that the constitutional injury was caused by a person with "final decision policymaking authority."
>
> **Calhoun**, 408 F.3d at 379 (*quoting* **McTigue v. City of Chicago**, 60 F.3d 381, 382 (7th Cir. 1995)

In each of these alternatives, "it is not enough for a ß1983 plaintiff merely to identify conduct properly attributable to the municipality." **Brown**, 520 U.S. at 404, 117 S.Ct. at 1388. Instead, "[t]he plaintiff must also demonstrate that, through its

11

deliberate conduct, the municipality was the 'moving force' behind the injury alleged." ***Brown***, 520 U.S. at 404, 117 S.Ct. at 1388 (holding that the plaintiff "must show that the municipal action was taken with the requisite degree of culpability and must demonstrate a direct causal link between the municipal action and the deprivation of federal rights)(emphasis in original); ***City of Canton***, 489 U.S. at 385, 109 S.Ct. at 1203.  *See also **Collins v. City of Harker Heights, Texas***, 503 U.S. 115, 122, 112 S.Ct. 1061, 1067, 117 L.Ed.2d 261 (1992) (emphasizing that the inquiry into municipal liability is wholly separate from the inquiry into the presence of a constitutional violation).

In cases in which an inadequate hiring procedure or failure to train form the basis of municipal liability, the plaintiffs must meet a stringent burden of showing that the municipality acted with "deliberate indifference."  *See **Brown***, 520 U.S. at 406-07, 117 S.Ct. at 1389-90 (applying the deliberate indifference standard to hiring); ***City of Canton***, 489 U.S. at 389, 109 S.Ct. at 1205 ("Only where a failure to train reflects a 'deliberate' or 'conscious' choice by a municipality . . . can a city be liable for such a failure under ß1983.").  Merely alleging the existence of a training program in a failure to train case is not enough.  ***City of Canton***, 489 U.S. at 389-90, 109 S.Ct. at 1205.  The plaintiffs must show that the training program was inadequate "in relation to the tasks the particular officers must perform." ***City of Canton***, 489 U.S. at 390, 109 S.Ct. at 1206.  Similarly, a plaintiff alleging that an inadequate hiring procedure led to the

12

violation of his rights cannot rely "on the mere probability that an officer inadequately screened will inflict any constitutional injury. Rather, [he must show] . . . that <u>this</u> officer was highly likely to inflict this <u>particular</u> injury suffered by the plaintiff." *Brown*, 520 U.S. at 412, 117 S.Ct. at 1392 (emphasis in original).

Here, the plaintiffs do not offer any evidence of the existence of a training program or what that program might entail, any evidence that the officers had a pre-hiring history of misconduct or that the hiring procedures at the Police Department were somehow inadequate, or any evidence that previous officer misconduct occurred, let alone that it was tolerated. The plaintiffs do not even specify what policies or customs led to their injuries, beyond the generalized, unsupported allegations that such policies and customs existed. Instead, the plaintiffs assert that such policies must exist by virtue of the officers' alleged misconduct during their arrest. In addition to the lack of evidentiary support for this argument, the plaintiffs' claim merely alleges liability under respondeat superior without explicitly using that terminology. Under firmly established Supreme Court precedent, the plaintiffs have failed to assert their failure to train, inadequate hiring, and tolerance of misconduct claims with enough support or specificity to survive summary judgment.

Summary judgment must be granted on the plaintiffs' Fourth Amendment claim that John was arrested with excessive force and

13

Fourteenth Amendment substantive due process claim as well.  The plaintiffs argue that John was treated with excessive force when he was shoved against the hood of his car, an officer threatened to beat him up, an officer deliberately cuffed him too tightly, and other officers refused to loosen the cuffs.  (Response Brief, pp. 3-4) Similarly, the plaintiffs argue that the officers violated their Fourteenth Amendment rights based upon ethnicity by calling John "Jose," making references to "you people," insisting that John was a drug dealer, ignoring requests to loosen the handcuffs, making lewd comments to Nora, and denying permission to make a phone call.  (Response Brief, p. 4) However, the plaintiffs attributed all of these actions, except the cuffing, to officers other than Kender.  (J. Berrios Dep. pp. 16-17, 21, 26, 76; N. Berrios Dep. pp. 4-5) Thus, by the plaintiffs' own admissions, the remaining defendant officer in this case did not act with excessive force or violate the plaintiffs' substantive due process rights.

Additionally, with respect to the excessive force claim, John's belief that Kender cuffed him is not enough to create a genuine issue of material fact for the jury, in light of his admission that he could not remember which officer did the cuffing.  *See, e.g.,* **Perry v. Norfolk and Western Railway Company**, 865 F.Supp. 1292, 1299 n.1 (N.D. Ind. 1994) (noting that a party's own contradictory statements do not create a genuine issue of material fact).  The plaintiffs do not dispute the defendants' argument in support of summary judgment on this

14

point.  As judgment is appropriate on this basis, the court will not reach the defendants' alternative excessive force argument that a tight handcuffs claim alone is not enough to rise to the level of a Fourth Amendment violation.

_____

For the foregoing reasons, the Motion for Summary Judgment filed by the defendants, Daniel Kender, Hammond Police Department, Unknown Officers John and Ronald Doe, Shawn McDaniel, and Officer Howard, on February 7, 2005, is **GRANTED**.

ENTERED this 11th day of July, 2005

                                           s/ ANDREW P. RODOVICH
                                               United States Magistrate Judge